UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

RUBEN CRAIG, III,

          Plaintiff,

          v.

SECRETARY JOHN WETZEL, *et al.*,

          Defendants.

CIVIL ACTION NO. 1:21-cv-02020

(SAPORITO, J.)

## MEMORANDUM

Plaintiff Ruben Craig, now incarcerated at SCI-Smithfield, proceeds *pro se* on claims arising from injuries he sustained from other prisoners at SCI-Dallas in November 2019. Defendants' motion for summary judgment (Doc. 54) is ripe for adjudication. For the reasons described below, the Court grants summary judgment on all claims except Craig's Eighth Amendment claims against defendants John Wetzel and Frank Depeiro.

## I.    BACKGROUND

Briefly summarized, Craig's complaint (Doc. 1) alleges that he was attacked by unknown prisoners at SCI-Dallas on November 3, 2019. He was temporarily placed in protective custody, but he alleges that various

defendants failed to properly investigate the incident despite his insistence that he was still in danger. On November 20, he was released from protective custody despite his objections. Defendant Depeiro intentionally placed him in "B Block," an area of the prison that did not have surveillance cameras, was not well-monitored by staff, and was disproportionately populated with violent inmates. The following day, he was "repeatedly stabbed in the head and face" by unknown inmates. He alleges that he has suffered permanent scarring, tinnitus, sinus injuries, vision problems, and post-traumatic stress disorder.

Craig asserts violations of his Eighth Amendment right to be free from cruel and unusual punishment, his First Amendment right "to Petition Government for Redress of Grievances," his Fourteenth Amendment right to "Equal Treatment as a Similarly Situated Person," and his due process rights. The defendants include then-Secretary of Corrections John Wetzel, then-Superintendent of SCI-Dallas Kevin Ransom[1], and nine employees affiliated with SCI-Dallas: Deputy

---

[1] Superintendent Ransom died while this case was pending. He has not yet been dismissed because 90 days have not elapsed since the defendants filed and served a statement noting his death. *See* (Doc. 76 (statement filed June 30, 2025)); Fed. R. Civ. P. 25(a)(1).

Superintendent Miller, Hearing Examiner Charles McKeown, Depeiro, Treverton, Kevin Fagen, Williams, Bohinski, John Doe #3, and John Doe #4.[2]

Defendants' motion for summary judgment is now ripe for adjudication.[3] Craig has also moved for summary judgment, but briefing on that motion has been delayed pending Craig's receipt of supplemental records from the DOC. *See* (Doc. 86).

## II.  LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[2] Williams and Bohinski were initially named as John Does #1 and #2, but were later identified through discovery. *See* (Doc. 35). Because Does #3 and #4 have not been identified, those defendants will be dismissed. *See Blakeslee v. Clinton Cnty.*, 336 F. App'x 248, 250 (3d Cir. 2009) ("If reasonable discovery does not unveil the proper identities . . . the John Doe defendants must be dismissed."); *Cole v. RHU Officers John Doe*, No. CIV. 1:04-CV-1218, 2005 WL 2648342, at *4 (M.D. Pa. Oct. 17, 2005).

[3] Defendants did not reply to Craig's brief in opposition to summary judgment (Doc. 85). Their request for additional time to do so, premised on the mistaken assertion that Craig had not filed a brief, was denied as moot, and they sought no further relief related to a potential reply. *See* (Docs. 87, 88).

Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S.

at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

III.    MATERIAL FACTS[4]

Construing all disputed facts in favor of Craig, the non-movant, the evidence indicates as follows:

---

[4] Craig's brief in opposition incorporates, by reference, arguments and record citations made in support of his own motion for summary judgment. *See* (Doc. 85 at 30). However, many of Craig's citations refer only to Bates numbers of discovery documents, or descriptions of the documents (*e.g.*, "PRC Hearing Report 20NOV19"), without any indication of whether or where those documents appear in the record. Consistent with the directive that *pro se* filings be liberally construed, the Court has attempted to identify the evidence in the record corresponding to Craig's citations. *See* Fed. R. Civ. P. 56(c)(3) (in addition to properly cited materials, "[t]he court . . . may consider other materials in the record"). Where the supporting evidence is not apparent, the fact is not accepted for purposes of the motion, and any contradictory statement by the defendants is deemed admitted. *See* Fed. R. Civ. P. 56(e); M.D. Pa. L.R. 56.1.

## A. November 3, 2019 Incident

On November 3, 2019, while incarcerated at SCI-Dallas, Craig was involved in an altercation in his cell. An incident report, written by defendant Trevethan, indicated that Craig reported to the infirmary "all beat up," with bruises on his hands. Questioned by Trevethan, Craig said that he "fell in the yard," but refused to answer any further questions. Surveillance video showed that Craig had not been in the yard, and Trevethan concluded that Craig had been fighting with his cellmate, who also had injuries "consistent with" a fight. Craig, who was "bleeding profusely," was taken to the hospital, where he received "sutures and surgical staples." He was also given antibiotics after showing symptoms of infection and a wound that "medical professionals identified as a bite wound." *See* (Doc. 85-1 at 3). When he returned from the hospital, he was sent to the Restricted Housing Unit (RHU).

Craig was charged with "fighting" and "lying to [an] employee," and a disciplinary hearing was held on November 7. In contrast to his initial claim that he fell, Craig provided oral and written statements that two or three unidentified prisoners entered his cell while he was "doz[ing] off"

and assaulted him with a metal object[5]. Craig said that he "had no reason to believe [his cellmate] was involved, and [does] not think he was even present." He also disputed that his hands were bruised. Although Craig could not identify the assailants or a reason for the attack, he stated that he had "no reason to suspect that this is over." Ultimately, he was found guilty of fighting, but not guilty of the charge of lying to staff.

On November 15, Craig filed a prison grievance complaining that the administration at SCI-Dallas, and the DOC generally, "creat[ed] an environment where . . . attacks [on prisoners are] prevalent." Specifically, Craig cited the November 3 incident as "one of a number of recent attacks" resulting from staff opening the doors to prisoners' cells; that cameras should have been installed on his block rather than in "staff areas"; and that he had been improperly housed with cellmates "having histories of deviant, assaultive behavior." *See* (Doc. 85-1 at 3).

---

[5] Craig, citing to his written statement, claims that he "attested" that his assailants were "armed with locks in socks" and attacked him "after the guards let the attackers into his cell." However, in the written statement itself, Craig did not mention locks, and said that he "vaguely recall[ed his] door opening" while he "doze[d] off," but did not see who opened the door. *See* (Doc. 77-4 at 3-4, 6; Doc. 80 at 8, ¶ 11). To the extent Craig's description exceeds what is reflected in the statement, that description is unsupported by evidence and is not considered.

## B. Release from RHU

The decision of when Craig would be released from the RHU was made by the Program Review Committee ("PRC"). On November 20, Craig attempted to speak to defendant Miller, the head of the PRC, but she "passed by" his cell and would not speak to him even though he "tried to tell her it was urgent." Unknown to Craig, the PRC had already determined that he would be released from the RHU that day. Craig became aware of the decision and told defendant Williams that he "wanted to be transferred to another jail." Williams replied: "well, just tell me what block you want to be transferred to here and we'll try to keep you safe." Craig requested to be placed on A Block. Craig also talked to Depeiro, who told Craig that he would be transferred to "a block where I could feel I'm safe," and Craig again requested A Block. (Craig Dep. 15:16-16:1, 45:15-46:11, 52:14-53:6). However, at approximately 6:30 or 7:00 p.m., Craig was transferred from the RHU to B Block. The receiving guards told Craig that Depeiro had made the decision to place him on B Block despite his request for A Block. (*Id.*, 17:4-20, 54:4-24).

The distinction between A Block and B Block was significant to Craig because "A block has almost no incidents, no violence, whereas B

block is perpetually violent." Craig testified that there were fewer staff observation areas on B Block (which Depeiro and some residents referred to as "the Jungle"), and thus less of a deterrent for inmate violence. Further, Depeiro often placed "more problematic and dangerous prisoners" on B Block, and "more docile and complaint" prisoners on A Block[6]. (Craig Dep. 18:2-20:7; Craig Aff. ¶ 4, 6 (Nov. 22, 2022)).

The following morning, Craig "told [Depeiro] I needed to be moved off [B] block, I didn't feel safe." Depeiro told Craig to "deal with it" and "made a comment about, you know, 'Well[,] get a knife like everyone else does,' and walked away." 45 minutes later, Craig was seen "bleeding from his face with a laceration and a bruise and lump on his forehead . . . consistent with an assault." The prison's report indicates that Craig "refused to give any information regarding his injuries." *See* (Doc. 74-6). However, Craig asserts that he told Superintendent Ransom and a lieutenant that he was "stabbed in the face by several people" (Craig Dep.

---

[6] The Court does not accept as fact, for summary judgment purposes, Craig's speculation that the motivation for Depeiro "cherry-picking" prisoners included "maximizing the safety and comfort of his staff and hi[m]self." *See* (Doc. 80 at 3, ¶ 4(c)). Even accepting Craig's allegation that more dangerous prisoners were concentrated on B Block, Craig's testimony and affidavits do not establish a basis for his personal knowledge of Depeiro's motivation. *See* Fed. R. Civ. P. 56(c)(4).

57:10-58:2), and that he told prison medical staff he had been "stabbed multiple times with a makeshift metal knife." He asserts that he suffered a deviated septum, hearing loss, and permanent tinnitus, among other injuries. (Doc. 80 at 28 (Craig Aff. June 28, 2025)).

### C. Conditions at SCI-Dallas

The DOC's own data indicates that between 2018 and 2020 at SCI-Dallas, there were at least 93 significant incidents of "inmate-on-inmate" violence, and 123 incidents of violence "in block" (where Craig's November 21 assault occurred).[7] Further, at the time Craig was attacked, there were no surveillance cameras covering the housing units. A DOC document titled "Declaration of Emergency for Construction or Repair Work," dated August 1, 2019, roughly four months before Craig's assault, describes the following "emergency" at SCI-Dallas: "The existing camera system at the facility is an analog camera system that does not cover the

---

[7] Craig contends that SCI-Dallas, in general, is more violent than SCI-Mercer and SCI-Phoenix, based the frequency of violent incidents relative to the listed capacities of each prison. *See* (Doc. 79; Doc. 85-1 at 17-18). For purposes of the instant motion, the material fact is that the DOC had documented numerous instances of inmate-on-inmate violence at SCI-Dallas, including in the parts of the prison where Craig was attacked.

housing units. A new IP camera system must be installed in the housing units to provide adequate security coverage . . . [I]t is critical for the safety and security of staff and inmates to have this completed as soon as possible." The declaration was signed as "approved," and a DOC administrator had "confirmed that funding will be made available." (Doc. 85-1 at 19). In an interrogatory response, defendant Wetzel stated: "We did not have cameras on the housing unit [in 2019] due to budget constraints. We began a project to install cameras around this time or shortly thereafter." (Doc. 40-6 at 17, ¶ 2). Aside from this statement, no party has presented evidence specifying when the camera installation began or when the cameras became operational.[8]

### D. Administrative Remedies

The DOC provides a three-part procedure for inmate grievances: initial review by a Grievance Officer, appeal to the Facility Manager, and

---

[8] Craig claims that camera installation was not completed until "late 2022." The allegation of that specific time of completion is not considered, as it appears to rely on evidence that is not in the record. *See* (Doc. 80 n.36). Nonetheless, to the extent defendants would argue that the commencement of a "project to install cameras [in 2019] or shortly thereafter" should defeat an inference of deliberate indifference, the lack of evidence on this point suggests an issue for trial.

final appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). Craig filed at least seven grievances related to the subject of this complaint. As relevant here[9], these included Grievance No. 838907, which complained specifically of Depeiro's decision to place him on B Block, and Grievance No. 840060, which complained of failure by the DOC and SCI-Dallas to curtail inmate-on-inmate violence. Both grievances were denied on initial review and by the facility manager. Craig submitted final level appeals for Grievance No. 838907 on January 26, 2025, and for Grievance No. 838907 on January 28, 2025. *See* (Doc. 85-1 at 9-10, 14-15).

On February 4, with those appeals pending, Craig was transferred from SCI-Dallas to SCI-Mercer for a court hearing, but he was

---

[9] Craig argues at length regarding all seven of his grievances. *See* (Doc. 85 at 10-30). For brevity, the Court's discussion is limited to two grievances relevant to the claims that survive this motion, *i.e.*, the Eighth Amendment claims against Wetzel and Depeiro. Although Wetzel himself does not appear to have been named in any grievance, Grievance No. 840060 described Craig's claim that the DOC's lack of security measures to address inmate-on-inmate violence constituted deliberate indifference to his safety. *See Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007) (to exhaust administrative remedies, the grievance in question must "alert prison officials to [the] problem," but need not "provide personal notice to a particular official that he may be sued") (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)).

"marooned" at SCI-Mercer through August 25 because of restrictions on prison transfers during the COVID-19 pandemic. *See* (Doc. 80 at 13, 15). On February 19, Grievance Review Officer Amanda West issued notices of "Action Required" for both grievances, indicating that Craig's appeals were subject to dismissal because he did not include copies of the lower-level responses. The notice granted Craig 15 working days in which to submit the documentation, as "a courtesy of this office." Despite Craig's transfer to SCI-Mercer, each form contains the notation "Current SCI: DAL." (Doc. 85-1 at 10, 15).

Craig did not receive the Action Required notices until he returned to SCI-Dallas. On September 3, after his return to SCI-Dallas, Craig re-filed his final grievance appeals. He explained that he had been located at SCI-Mercer "without [his] property," and was thus unable to respond to the "Action Required" notice, despite requests to staff to have his property forwarded from SCI-Dallas. (Doc. 85 at 15). Nonetheless, Craig's final appeals were both dismissed on September 28, 2020, on the basis that "[t]his office sen[t] you an action required notice dated 2/19/20 advising that you had 15 working days to provide the remaining required documentation; however, the documents weren't received until 9/10/20."

(Doc. 85-1 at 10, 15).

## IV.   DISCUSSION

### A. Exhaustion of Administrative Remedies

Defendants request summary judgment on the basis that Craig

failed to exhaust administrative remedies. Under the Prison Litigation

Reform Act ("PLRA"), prisoners complaining about the conditions of their

confinement must exhaust available administrative remedies before

filing suit in federal court. 42 U.S.C. § 1997e(a). The PLRA requires

proper exhaustion, meaning plaintiffs must administratively grieve their

claims in accordance with the procedural rules of the prison in which they

are incarcerated. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir.

2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). However, the

prisoner is only required to exhaust administrative remedies that are

"available." *See Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018)

(citing *Woodford*, 548 U.S. at 93 (2006)). A prison grievance process is

unavailable, and thus may be deemed exhausted: (1) when the remedy

"operates as a simple dead end—with officers unable or consistently

unwilling to provide any relief to aggrieved inmates"; (2) when it is "so

opaque that it becomes, practically speaking, incapable of use"; or (3)

"when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *See Hardy v. Shaikh*, 959 F.3d 578, 584-87 (3d Cir. 2020) (quoting *Ross v. Blake*, 578 U.S. 632, 643 (2016)).

The DOC's grievance policy does not specifically address the situation where an Action Required notice is appropriately[10] generated but not delivered to the complainant. *See* (Doc. 74-8 at 7-41 (DC-ADM 804)). The policy indicates that an inmate who is "transferred . . . prior to the appeal process being completed . . . may continue to pursue the grievance or appeal by notifying the Facility Manager of the facility where the grievance was originally filed." *See* (*id.* at 29, § 2(B)(2)(j)). Craig sought help from staff at SCI-Mercer, but there is no evidence that he notified the Facility Manager of SCI-Dallas. However, the policy also requires that an appeal to final review be "responded to within 30 working days of receipt unless otherwise extended." (*Id.* at 27, § 2(B)(2)(a)). One court found that SOIGA violated this rule when it failed to deliver an Action Required notice to the prisoner within 30 days, and

---

[10] Craig does not dispute that he failed to submit the appropriate documentation with his initial appeals, or that the Action Required notices were justified.

thus the prisoner had exhausted all available remedies. *See Kendrick v. Hann*, No. 1:19-CV-1642, 2022 WL 13978767, at *2, 6-7 (M.D. Pa. Oct. 21, 2022) (quoting *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019) ("As soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable . . .")).

Ultimately, given that Craig did not receive the Action Required notices, and that the grievance policy provides no clear procedure for this circumstance, the Court finds a genuine issue of material fact as to whether further administrative remedies were "unavailable." *See Kendrick*, 2022 WL 13978767, at *6-7; *Miller v. McClure*, No. 2:17-CV-01457, 2020 WL 1049750, at *5 (W.D. Pa. Mar. 4, 2020) (exhaustion "excused" where a prisoner who learned of an Action Required notice after the applicable deadline "forwarded 'everything right away'"); *see also Small v. Camden Cnty.*, 728 F.3d 265, 273 (3d Cir. 2013) (administrative remedies unavailable where the grievance policy "did not contemplate" the appropriate procedure when a prisoner does not receive a response).

## B. Eighth Amendment Claims

Turning to the merits, the parties' briefing is primarily devoted to Craig's Eighth Amendment claims premised on deliberate indifference to his risk of assault by other prisoners. Defendants argue that Craig's evidence does not show a violation of his Eighth Amendment rights, or if it did, that various defendants were not personally involved. For the following reasons, Craig's claim cannot proceed against defendants Ransom, Miller, McKeown, Treverton, Fagen, Williams, and Bohinski.

In general, "[p]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citation omitted). To state a failure to protect claim under the Eighth Amendment, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and the prison official must exhibit deliberate indifference, meaning that the officials "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. A defendant can rebut a prima facie demonstration of deliberate indifference by showing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring.

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 844).

First, Craig imputes deliberate indifference from various defendants' knowledge of his statements about the November 3 assault. He stated cryptically that he had "no reason to suspect that this is over," but he provided no facts to support that speculation. This single, unexplained altercation would not itself show an ongoing, substantial risk of serious harm sufficient to show deliberate indifference. *See Allam v. McGinley*, No. 1:20-CV-00933, 2021 WL 253978, at *4 (M.D. Pa. Jan. 26, 2021) (description of a "single incident" of violence, combined with other vague allegations that "merely articulated a generalized fear of harm," was insufficient) (citations omitted). Moreover, prison staff investigated the incident and found, contrary to Craig's shifting allegations, that his injuries arose from a fight with his cellmate. Craig claims there was "no evidence" for that conclusion, but this ignores that his cellmate was found with injuries consistent with a fight. Craig disagrees with the investigative findings of the prison staff, but that disagreement does not show deliberate indifference by the investigators, the hearing officer, or any other defendant who was later informed about

this incident.

Craig's later complaints from the RHU are also insufficient to impute deliberate indifference. His November 15 grievance complained that cameras had been installed in "staff areas" rather than housing units, and that unspecified prior cellmates had "histories of deviant, assaultive behavior."[11] His oral complaints to officers on the day of his release from the RHU[12] provided no further detail, other than that he did not feel "safe." These vague and general complaints would not put a defendant on notice of a specific, substantial risk of serious harm.[13] Thus,

---

[11] The November 15 grievance also complained that the November 3 incident was "one of a number of recent attacks" resulting from staff opening the doors to prisoners' cells. However, as noted above (n. 5), there was no apparent basis for Craig to allege this given that he claimed to be asleep when his door was opened and unaware of who opened it.

[12] Craig also objects that the procedure of his release from the RHU violated prison policy, but "a prison policy manual does not have the force of law and does not rise to the level of a constitutional violation." *See Jordan v. Rowley*, No. 1:16-CV-1261, 2017 WL 2813294, at *2 (M.D. Pa. June 29, 2017) (quotations and citations omitted).

[13] *See Bistrian v. Levi*, 696 F.3d 352, 371 (3d Cir. 2012) ("the risk that an inmate with a history of violence might attack another inmate for an unknown reason" is insufficient for a failure-to-protect claim); *Blackstone v. Thompson*, 568 F. App'x 82, 83-84 (3d Cir. 2014) (nonprecedential); *Bracey v. Harlow*, No. CV 11-04 E, 2013 WL 12203244, at *8-9 (W.D. Pa. Aug. 21, 2013) (isolated prior fights among inmates did
*(continued on next page)*

to the extent these complaints were presented, directly or indirectly, to defendants Ransom, Miller, McKeown, Treverton, Fagen, Williams, and Bohinski, they do not support an inference of deliberate indifference, and those defendants are entitled to summary judgment on this claim.

## C. Depeiro

However, the evidence supports a viable Eighth Amendment claim against Depeiro. On this record, Depeiro is differently situated from the other defendants, because he alone directed that Craig be placed on B Block after his release from the RHU. Further, Depeiro's knowledge of the risk was not merely based on Craig's generalized complaints or statements that he did not feel "safe." Viewed in the light most favorable to Craig, the record indicates that Craig was to be placed on A Block for his safety, but Depeiro used his authority as unit manager to overrule that recommendation. The evidence that Depeiro advised Craig to "get a knife like everyone else does" on B Block, and that Depeiro routinely placed more violent prisoners on that block (and referred to it as "the Jungle"), combined with the alleged lack of staff presence on the block,

_____

not establish a sufficient "pattern of violence to put officials on notice" of a substantial risk to the plaintiff) (listing cases).

all support an inference that Depeiro knew Craig's placement there would pose a concrete, substantial risk of serious harm. Although Depeiro would not have been able to identify the potential assailant(s), that is not dispositive of deliberate indifference, given his particularized knowledge of the conditions in B Block to which Craig was exposed. *See Farmer*, 511 U.S. at 843 ("[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."); *Riley v. Jeffes*, 777 F.2d 143, 145-48 (3d Cir. 1985).

Defendants assert Depeiro's entitlement to qualified immunity. Qualified immunity applies to federal and state actors unless (1) the facts, taken in the light most favorable to the plaintiff, demonstrate a violation, and (2) the alleged right was clearly established at the time of the violation. *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023) (citation omitted). A clearly established right is one so apparent that "every reasonable official would understand that what he is doing is unlawful." *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

"[T]he right to be protected against violence inflicted by other inmates is clearly established." *Williams v. Smith*, 507 F. App'x 260, 263 (3d Cir. 2012). A reasonable prison official would know that intentionally placing an inmate in a dangerous and poorly monitored area of the prison and telling him to defend himself by "get[ting] a knife like everyone else does" would be unlawful. Evidence of such conduct forecloses any entitlement to qualified immunity at the summary judgment stage. *See, e.g.*, *Burk v. Runk*, No. 1:19-CV-01358, 2021 WL 6126233, at *8 (M.D. Pa. Dec. 28, 2021) ("Because Burk has made a showing sufficient to overcome Defendants' Rule 56 motion as to the merits of his failure-to-protect claim, he has 'also made a showing sufficient to overcome any claim to qualified immunity.'") (quoting *Beers-Capitol*, 256 F.3d at 142 n.15); *Wilson v. Gromel*, No. 3:18-CV-1637, 2023 WL 2088429, at *6-7 (M.D. Pa. Feb. 17, 2023).

### D. Wetzel

The evidence also supports a viable claim against Secretary Wetzel based on the absence of surveillance cameras, or other adequate security measures, on the housing units at SCI-Dallas. Clearly, the absence of surveillance cameras on a prison housing unit does not automatically

create an Eighth Amendment claim for any prisoner injured there.[14]
However, in this case, the August 2019 Emergency Declaration explicitly
acknowledged that cameras "must be installed" on the SCI-Dallas
housing units "to provide adequate security coverage . . . It is critical for
the security and safety of staff and inmates to have this completed as
soon as possible." This evidence, along with the data regarding inmate
assaults at SCI-Dallas, supports an inference that Craig was
"incarcerated under conditions posing a substantial risk of serious harm"
at SCI-Dallas in November 2019. *Farmer*, 511 U.S. at 837.

    This same evidence supports an inference of deliberate indifference
by Wetzel[15] specifically. "If an Eighth Amendment plaintiff presents

---

[14] *See, e.g., Lee v. Link*, No. 17-CV-2528, 2018 WL 1156154, at *3
(E.D. Pa. Mar. 5, 2018) ("Although prison blind spots undoubtedly create
a risk of danger to inmates, making prison officials' knowledge of a blind
spot relevant to the deliberate indifference inquiry, knowledge of the
existence of a blind spot, standing alone, does not support the reasonable
inference that prison officials knew of a substantial risk of serious harm
to inmate safety.").

[15] Defendants argue that Wetzel lacked the requisite "personal
involvement" with Craig, but the evidence supports an inference of
Wetzel's "participation or actual knowledge and acquiescence" in the
constitutional violation. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d
Cir. 1988). The fact that Craig did not speak to Wetzel, or that Wetzel did
not know of the facts of Craig's case in advance, is not dispositive. *See*,
*(continued on next page)*

evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence would permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer*, 511 U.S. at 842-43. Such is the case here. Taking all facts and reasonable inferences in Craig's favor, the record indicates that Wetzel participated[16] in the decision not to install cameras in the housing units of SCI-Dallas prior to November 2019, and through that participation, would have known of the DOC's acknowledgement that not having cameras was an imminent emergency for inmate security. As

_____

*e.g., Jeffes*, 777 F.2d at 146-47 (permitting claims against "'high' prison officials having the responsibility and duty to take affirmative corrective action").

[16] Craig argues that all defendants were generally "aware of the dangers associated with having no surveillance . . . as evidenced by the 2019 Emergency Declaration . . .". However, there is no evidence that any named defendant at SCI-Dallas was specifically aware of the declaration, and as noted above, awareness of general "dangers" of not having surveillance cameras would be insufficient. *See Victor v. Wetzel*, No. 1:20-CV-425, 2020 WL 2374378, at *6-7 (M.D. Pa. Mar. 13, 2020); *Link*, 2018 WL 1156154, at *3.

noted, the lack of cameras is not itself dispositive; what is important is the absence of evidence that Wetzel, and the officials under his command, sought to alleviate the "emergency" of Craig's substantial risk of serious harm between August 2019, when the emergency was acknowledged, and November 2019, when Craig was assaulted.

On this record, Wetzel is not entitled to qualified immunity. In general, federal courts afford the decisions of prison administrators, particularly those of state prisons, considerable deference. *See Turner v. Safley*, 482 U.S. 78, 84-85 (1987) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."). Matters of institutional security "are peculiarly within the province and professional expertise of corrections officials, and . . . courts should ordinarily defer to their expert judgment in such matters." *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979). However, the record, construed in the light most favorable to Craig, does not suggest a "judgment" to forgo cameras for some alternative means of security. Rather, the record indicates that as of November 2019, nothing had been done to ameliorate the "emergency"

documented more than three months before.

As noted, a prisoner's right not to be "violently assaulted in prison," and prison officials' corresponding duty to take "reasonable measures to guarantee the safety of the inmates," are beyond dispute. *See Farmer*, 511 U.S. at 832-34. The existence of budget constraints would not supersede this obligation; "the cost of protecting a constitutional right cannot justify its total denial." *Bounds v. Smith*, 430 U.S. 817, 825 (1977); *see also Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 336-37 (3d Cir. 1987). Thus, even accounting for budget issues, it is clearly established that prison officials must take reasonable measures to ameliorate known conditions posing a substantial risk of inmate-on-inmate violence.[17] Therefore, Wetzel is not entitled to summary judgment

---

[17] *See Farmer*, 511 U.S. at 832; *see, e.g.*, *Ryan v. Burlington Cnty., N.J.*, 708 F. Supp. 623, 630-33 (D.N.J.), aff'd, 889 F.2d 1286 (3d Cir. 1989) (denying qualified immunity to a prison board based on prisoners' clearly established right to a "safe prison environment" free from inmate violence); *Barefield v. Dunn*, 688 F. Supp. 3d 1026, 1095 (M.D. Ala. 2023) (qualified immunity inappropriate because the relevant officials "were on notice that taking no action when knowingly faced with an indisputably excessive risk of inmate-on-inmate violence from conditions of confinement constitutes a violation of the Eighth Amendment."); *Wilson v. Dunn*, 618 F. Supp. 3d 1253, 1281-83 (N.D. Ala. 2022) (prison defendants' failure to "create" or "enforce" policies to remedy known conditions of widespread violence violated a clearly established right).

on Craig's Eighth Amendment claim.

### E. First, Fifth and Fourteenth Amendment Claims

Craig asserts violations of three other constitutional rights, which he does not directly address in his briefing: his First Amendment right "to Petition Government for Redress of Grievances," his Fourteenth Amendment right to "Equal Treatment as a Similarly Situated Person," and his due process rights. Defendants are entitled to summary judgment on all of these claims.

As described in his complaint, Craig's First Amendment claim is premised on "the breakdown in the grievance system resulting in his assault." However, "[v]iolations of grievance procedures do not give rise to a cognizable claim under section 1983," because prison inmates do not have a constitutionally protected right to a grievance process. *Iwanicki v. Pennsylvania Dep't of Corr.*, 582 F. App'x 75, 81 (3d Cir. 2014); *Jackson v. Gordon*, 145 F. App'x 774, 777 (3d Cir. 2005). Next, Craig appears to allege an equal protection claim, but he has not presented evidence of any "similarly situated" inmates, nor shown that he was intentionally treated differently from other inmates because of membership in a protected class. *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 (3d Cir. 2016).

To the contrary, Craig's contentions of systemic issues at SCI-Dallas undermine any claim of intentional discrimination against him personally.

Finally, Craig asserts a violation of his due process rights, which the Court construes as a challenge to the disciplinary proceedings that followed the November 3 assault. Although the record is unclear, it appears that Craig's sanction was initially intended to be 30 to 60 days in disciplinary segregation, which was shortened due to his early release by the PRC. *See* (Doc. 74-4 at 6); (Craig Dep. 46:21-47:5). Placement in disciplinary segregation for this length of time would not implicate a liberty interest giving rise to a due process claim. *See Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002) (seven months in disciplinary segregation was insufficient to trigger a due process violation: "[C]onfinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest.") (quoting *Sandin v. Conner*, 515 U.S. 472, 486 (1995)). Nor has Craig presented evidence of any flaw in the disciplinary proceedings, aside from his disagreement with the hearing examiner's findings. *See, e.g., McKeithan v. Beard*, 322 F. App'x

194, 199 (3d Cir. 2009) ("Due process requires only that a prisoner have an opportunity to rebut the allegedly false accusations and evidence.").

## V.    CONCLUSION

For the reasons described above, defendants' motion for summary judgment will be granted in part, and the case will proceed only on Craig's Eighth Amendment claims against Wetzel and Depeiro. An appropriate order follows.


Dated: September 22, 2025          *s/Joseph F. Saporito, Jr.*
                                   JOSEPH F. SAPORITO, JR.
                                   United States District Judge